T.C. Memo. 1997-271

UNITED STATES TAX COURT

ROBERT D. AND PATRICIA K. KALIBAN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4252-89, 4253-89        Filed June 16, 1997.
            10802-89, 10803-89
            27659-89, 27660-89.

    <u>Stuart A. Smith</u> and <u>David H. Schnabel</u>, for petitioners.

    <u>Donald A. Glasel</u> and <u>Frances Ferrito Regan</u>, for respondent
in docket Nos. 4252-89 and 27659-89.

    <u>Wendy Sands</u> and <u>Frances Ferrito Regan</u>, for respondent in
docket No. 4253-89.

---

[1]    Cases of the following petitioners are consolidated for
opinion:  Robert D. and Patricia K. Kaliban, docket Nos. 4252-89
and 27659-89; Estate of Karl Weber, Deceased, and Estate of
Marjorie Weber, Deceased, David Alter, Executor, docket No.
10802-89; Steve and Lispet Roland, docket No. 4253-89; and Lionel
and Betty Zimmer, docket Nos. 10803-89 and 27660-89.

Mitchell B. Hausman and Frances Ferrito Regan, for

respondent in docket No. 10802-89.

Jennifer J. Kohler and Frances Ferrito Regan, for respondent

in docket Nos. 10803-89 and 27660-89.

CONTENTS

Page

MEMORANDUM FINDINGS OF FACT AND OPINION....................... 2
OPINION OF THE SPECIAL TRIAL JUDGE........................... 3
FINDINGS OF FACT............................................ 6
  A. The Plastics Recycling Transactions..................... 6
  B. The Partnerships....................................... 8
  C. David Alter and Martin Feinstein.......................11
  D. Petitioners and Their Introduction to the Partnership
    Transactions...........................................16
    1. Robert and Patricia Kaliban.........................17
    2. Steve and Lispet Roland.............................19
    3. Karl and Marjorie Weber.............................21
    4. Lionel and Betty Zimmer.............................23
OPINION.....................................................26
  A. Section 6653(a)--Negligence............................28
    1. The So-Called Oil Crisis............................29
    2. Petitioners' Purported Reliance on Advisers........32
    3. Miscellaneous.......................................43
    4. Conclusion as to Negligence.........................53
  B. Section 6659--Valuation Overstatement..................54
    1. The Grounds for Petitioners' Underpayments.........55
    2. Concession of the Deficiencies.....................60
    3. Section 6659(e)....................................64
  C. Petitioners' Motions For Leave To File Motion For
    Decision Ordering Relief From the Negligence Penalty
    and the Penalty Rate of Interest and To File Supporting
    Memorandum of Law......................................67

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases were assigned to Special Trial

Judge Norman H. Wolfe pursuant to the provisions of section

7443A(b)(4) and Rules 180, 181, and 183.  They were tried and

briefed separately but consolidated for purposes of opinion.[2]

All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transactions and the Sentinel recyclers in these cases are substantially identical to those considered in the Provizer case.

In four notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' 1981 Federal income taxes:

|  |  | Additions to Tax | | |
| Petitioners | Deficiency | [1]Sec. 6653(a)(1) | [1]Sec. 6653(a)(2) | Sec. 6659 |
| Kaliban | $26,571 | $1,328.55 | [2] | [3]$7,971.30 |
| Roland | 27,994 | 1,399.70 | [2] | [3]8,398.20 |
| Weber | 27,642 | 1,382 | [2] | [3]8,293 |
| Zimmer | 27,303 | 1,365 | [2] | 8,191 |

[1]Except for the notice of deficiency issued to the Webers, the notices refer to section 6653(a)(1)(A) and (B). During 1981, the additions to tax for negligence were provided for under section 6653(a)(1) and (2).

---

[2] By order dated Mar. 21, 1994, docket Nos. 4252-89 and 27659-89 (the Kaliban cases) were consolidated for trial, briefing, and opinion. By another order dated Mar. 21, 1994, docket Nos. 10803-89 and 27660-89 (the Zimmer cases) were also consolidated for trial, briefing, and opinion.

[2]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.
    [3]In the alternative to the section 6659 addition to tax, respondent determined an addition to tax under section 6661 for substantial understatement of liability.

Respondent also determined that interest on the deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).

In another two notices of deficiency, respondent determined deficiencies in the 1982 Federal income taxes of the Kalibans and the Zimmers in the amount of $204 each, plus additions to tax for negligence under section 6653(a)(1) in the amount of $10.20 each, and under section 6653(a)(2) on 50 percent of the interest payable with respect to $204.[3]

The parties in each of these cases filed Stipulations of Settled Issues concerning the adjustments relating to petitioners' participation in the Plastics Recycling Program. The stipulations generally provide:[4]

    1.  Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.

---

[3]    The notices of deficiency for 1982 refer to sec. 6653(a)(1)(A) and (B).  During 1982, the additions to tax for negligence were provided for under sec. 6653(a)(1) and (2).

[4]    The stipulations of settled issues in the Kaliban cases (docket Nos. 4252-89 and 27659-89) do not contain the fourth stipulation.  The stipulation of settled issues in the Weber case (docket No. 10802-89) expressly refers to taxable year 1981.

2.  The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).

3.  This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

4.  With respect to the issue of the addition to the tax under I.R.C. §6659, the petitioners do not intend to contest the value of the Sentinel Recycler or the existence of a valuation overstatement on the Petitioners' returns; however, Petitioners reserve their right to argue that the underpayment in tax is not attributable to a valuation overstatement within the meaning of I.R.C. §6659(a)(1), and that the Secretary should have waived the addition to tax pursuant to the provisions of I.R.C. §6659(e).

Long after the trials of these cases, in each case petitioners filed a Motion For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50.  These motions were filed with attached exhibits in October and November of 1995.  Petitioners concurrently lodged with the Court motions for decision ordering relief from the additions to tax for negligence and the increased rate of interest, with attachments and memoranda in support of the motions. Subsequently, respondent filed objections, with attachments and memoranda in support thereof, and petitioners thereafter filed

reply memoranda. For reasons discussed in more detail at the end of this opinion, and also in Farrell v. Commissioner, T.C. Memo. 1996-295, these motions shall be denied; see also Sann v. Commissioner, T.C. Memo. 1997-259; Friedman v. Commissioner, T.C. Memo. 1996-558; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

The issues remaining in these consolidated cases are: (1) Whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2); and (2) whether petitioners are liable for the additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A. The Plastics Recycling Transactions

These cases concern petitioners' investments in two limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: Clearwater Group (Clearwater) and Poly Reclamation Associates (Poly Reclamation). Petitioners Kaliban, Roland, and Zimmer are limited partners in Poly Reclamation. Petitioners

Weber were limited partners in Clearwater. For convenience we refer to these partnerships collectively as the Partnerships.

The Clearwater partnership and the transactions involving the Sentinel EPE Recyclers leased by Clearwater were considered in Provizer v. Commissioner, supra. The transactions involving the Sentinel EPE recyclers purportedly leased by Poly Reclamation are substantially identical to the Clearwater transactions. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and

leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and up to the end of 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, Poly Reclamation leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. Apart from the entity that leased the machines from F & G Corp. and licensed them to FMEC Corp., the transactions of the Partnerships do not differ in any substantive respects.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

B. The Partnerships

Clearwater and Poly Reclamation are New York limited partnerships. Both partnerships closed during the last few

months of 1981.  Samuel L. Winer (Winer) is the general partner
of both Clearwater and Poly Reclamation.

With respect to each of the Partnerships, a private
placement memorandum was distributed to potential limited
partners.  Reports by F & G Corp.'s evaluators, Dr. Stanley M.
Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z.
Burstein (Burstein), a mathematics professor, were appended to
the offering memoranda.  Ulanoff owns a 1.27-percent interest in
Plymouth Equipment Associates and a 4.37-percent interest in
Taylor Recycling Associates, partnerships that leased Sentinel
recyclers.  Burstein owns a 2.605-percent interest in Empire
Associates and a 5.82-percent interest in Jefferson Recycling
Associates, also partnerships that leased Sentinel recyclers.
Burstein also was a client and business associate of Elliot I.
Miller (Miller), the corporate counsel to PI.

The offering memoranda for Clearwater and Poly Reclamation
each state that the general partner will receive fees from those
partnerships in the amount of $60,000.  In addition, each of the
offering memoranda provides that the general partner "may retain
as additional compensation all amounts not paid as sales
commissions or offeree representative fees".  According to the
offering memoranda, 10 percent of the proceeds from the offering
($80,000 in each case) was allocated to the payment of sales
commissions and offeree representative fees.  Winer therefore was

to receive a minimum of $60,000 and up to $140,000 from each Partnership.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

Although the offering memoranda represented that the Sentinel EPE recycler was a unique machine, it was not unique. Several machines capable of densifying low density materials were already on the market in 1981. Other plastics recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

## C. David Alter and Martin Feinstein

David Alter (Alter) is a graduate of the Harvard Law School and has been practicing law in New York since 1950.  He has been a partner in several law firms since 1954:  From 1954 to 1966 Alter was a partner at the law firm of Squadron, Alter & Weinrib; from 1966 to 1979 he was a partner at the law firm of Alter, LeFevre, Raphael & Lowry (Alter, LeFevre);[5] and from 1979 to 1989 he was a partner at the law firm of Shea & Gould.  Alter has been engaged in the general practice of law with a concentration in entertainment and labor law.  Among the services he provided to his clients were the preparation and review of contracts, general tax advice, estate planning, and administering and maintaining financial records.  On occasion, some of Alter's clients asked him to review offering materials for investment opportunities that they had learned of elsewhere.  In the course of his practice, Alter advised his clients as to the validity and merit of such investments.

Alter learned of the Plastics Recycling transactions from one of the partners at Shea & Gould, Stuart Hirshfield (Hirshfield), who in turn had been introduced to the transactions by Winer, the general partner of the Partnerships.  Alter

---

[5]    Alter, LeFevre underwent several name changes during the time Alter was a partner.  Apparently, Alter, LeFevre, Raphael & Lowry was the name of the firm by 1978.  For convenience, references to "Alter, LeFevre" include its predecessor names while Alter was a partner.

understood that Hirshfield had previously done business with Winer and thought well of him. Alter read the Poly Reclamation offering memorandum and attended some meetings with other partners who were considering an investment in the Plastics Recycling transactions, including Hirshfield, Dan Carroll (Carroll), Joseph Ferraro (Ferraro), Lonn Trost (Trost), and Alan Parker (Parker), a tax partner at Shea & Gould. He understood that Carroll had a background in engineering, and that Ferraro, who at the time represented British Petroleum, had worked at a plastics company for one or more summers during law school. Martin Feinstein (Feinstein), an associate at Shea & Gould, also reviewed the Plastics Recycling transactions for Alter and some of Alter's clients.

Feinstein has a B.A. in economics from Brooklyn College and graduated cum laude from the New York University Law School. He is a member of the New York State bar, and during 1981 he also was a certified public accountant (C.P.A.). Feinstein earned the credits that enabled him to sit for the C.P.A. exam from New York University. During law school, and for a time afterward, Feinstein worked at an accounting firm. He then was employed by a business management company, Vincent Andrews, Inc. (VAI). VAI managed the finances of people primarily in the entertainment and theatrical industry. Feinstein specialized in tax matters and budgeting at VAI. He and Alter met in 1969 through a VAI client, Bill Cullen, who at the time also was represented by Alter in a

tax matter.  Feinstein subsequently became associated with Alter, LeFevre sometime in 1969.

Feinstein continued to advise individuals regarding financial and tax matters at Alter, LeFevre.  The firm provided various financial services to its clients.  For some clients, it maintained checking accounts, paid bills, and prepared weekly statements showing the client's opening balance, deposits, withdrawals, and expenditures.  On January 1, 1979, Alter, LeFevre merged with another law firm, Aranow & Brodsky, but the resulting firm ceased operations by Labor Day of that year, and that same month Alter became a partner at Shea & Gould and Feinstein also became associated with that firm.

In the fall of 1981, Alter asked Feinstein to review the Plastics Recycling transactions as a potential investment for Alter and some of his clients.  Feinstein received a copy of a Partnership offering memorandum from Winer.  He spent approximately 4 to 6 hours reviewing it, including the financial projections and the tax opinion.  Feinstein understood that Hirshfield and Ferraro had spoken to members of the law firm that drafted the tax opinion, and that they and Trost were satisfied with the opinion.  He also understood that "someone asked one of the tax partners to look at the thing in general", but he did not know "how much detail * * * [Shea & Gould] did."  Although Alter claims that he asked Feinstein "to check with the tax partner in the firm, Alan Parker," Feinstein did not speak to Parker.

Feinstein relied on the offering memorandum for the value of the Sentinel EPE recycler. He understood that the purported value of the Sentinel EPE recycler was based upon a projected stream of future income. Feinstein did not verify the manufacturing cost of a Sentinel EPE recycler beyond speaking with a friend and associate[6] "about pricing and how things are priced in that industry." He understood from his friend that the stream-of-income method of valuation was not an unusual means of pricing equipment. Feinstein reviewed the stream of income projections in the offering memorandum, but did not verify any of the assumptions upon which they were based. He did not research or investigate the market for plastics recyclers or recycled resin pellets.

Feinstein spoke to a friend, Jerry Lauren (Lauren), who was a manufacturer's representative in the plastics packaging industry. He understood from Lauren that PI was a privately owned company that made specialized machinery for companies involved in the packaging industry. Feinstein did not formally hire or pay Lauren. He did not provide Lauren with a copy of the Poly Reclamation offering memorandum. Lauren did not prepare a written report for Feinstein. Feinstein "never asked * * * [Lauren] anything about the partnership". He only asked Lauren what he knew about PI. Feinstein did not ask Lauren, or anyone

---

[6] Feinstein did not state who this friend and associate was or what his or her credentials were.

else, whether any plastics recycling machines comparable to the Sentinel recycling machines already were available on the market.

Feinstein has no education or experience in plastics materials or plastics recycling, and he was not under the impression that Hirshfield, Trost, or Ferraro had any significant education or experience in the plastics industry. He did not visit PI, and he did not indicate that he ever saw a Sentinel EPE recycler. Feinstein did not review any marketing plans or research the market for plastics recyclers or recycled ground resin pellets. He was unaware that the Sentinel EPE recycler was incapable of recycling expanded polyethylene by itself, and had to be used in a system of grinders, extruders, and pelletizers. Feinstein did not know how many other partnerships would be leasing Sentinel recyclers. Neither Feinstein nor Lauren invested in any of the Plastics Recycling transactions.

Feinstein told Alter about Lauren and his comments about PI. Alter knew that Lauren and Feinstein had not visited PI, or investigated whether competitive machines existed, or made a judgment as to the value of a Sentinel EPE recycler. He also knew that neither Feinstein nor Lauren personally invested in a Plastics Recycling transaction. Alter accepted the fair market value of the Sentinel EPE recycler as set out in the Poly Reclamation offering memorandum. He had "no competence to" confirm the value of the machines or "to do any comparison", and did not hire anyone to value the machine. Like Feinstein, Alter

did not know that the Sentinel EPE recycler did not recycle plastic by itself, but had to be used in connection with other machines. Alter did not review any plastics industry trade journals for competing recyclers or otherwise inquire as to whether there were any comparable machines already on the market.

Alter told certain of his clients that he was investing in a Plastics Recycling transaction and that the investment was open to them as well. He informed them that he and other members of Shea & Gould thought that the investment seemed sound. Feinstein and Alter met with these clients and explained the investment. Alter did not advise his clients to read an offering memorandum, but one was available for them to read. He did not suggest that they consult with any plastics experts. A number of Alter's clients, as well as Alter, invested in a Plastics Recycling transaction in 1981. Alter's knowledge of PI was limited to the information in the offering materials, what he learned at meetings with his partners at Shea & Gould, and what Feinstein told him. The warnings and caveats in the offering memoranda did not concern him. Alter knew that Feinstein did not have any expertise in plastics materials or plastics recycling.

D. Petitioners and Their Introduction to the Partnership Transactions

Petitioners in these cases do not have any education or work experience in plastics recycling or plastics materials. They did not read the offering materials distributed by the Partnerships

or independently investigate the Sentinel EPE recyclers. None of petitioners saw a Sentinel EPE recycler or any other type of plastics recycler prior to participating in the recycling ventures. Petitioners never made a profit in any year from their respective investments in the Partnerships.

### 1. Robert and Patricia Kaliban

Petitioners Robert and Patricia Kaliban resided in Garden City, New York, when their petitions were filed.[7] Robert Kaliban (Kaliban) earned a B.A. degree from Loras College in Dubuque, Iowa, and an honors diploma from the Royal Academy of Dramatic Art in London, England. He then served in the Army before becoming a professional actor. Kaliban performed in touring productions in Chicago, Milwaukee, Los Angeles, and San Francisco. In 1960 he moved to New York City and performed in Broadway shows and reviews, and at the World's Fair. Kaliban then performed on-camera and did voice-overs for commercials.

Sometime in the late 1960's Kaliban became a member of the board of directors of the Screen Actors Guild. In that capacity he met Alter, who was counsel to the Screen Actors Guild. Kaliban hired Alter to manage his personal finances in the early 1970's. Alter and Feinstein collected income disbursements from various employers of Kaliban and oversaw the payment of his

---

[7] Petitioner Patricia Kaliban is a party to the cases of docket Nos. 4252-89 and 27659-89 solely because she filed a joint Federal income tax return with her husband for the years in issue.

bills. They also prepared Kaliban's tax returns and reviewed investment opportunities that had been suggested to him by others. Prior to 1981, Kaliban invested in two successful real estate ventures in which Alter also participated. On their joint 1981 Federal Income tax return, Robert and Patricia Kaliban reported gross income from wages, interest, dividends, State and local tax refunds, and capital gains in excess of $282,000.

Kaliban acquired a 1.547-percent interest in Poly Reclamation for $12,500 in 1981. As a result of the investment in Poly Reclamation, on their 1981 Federal income tax return Kaliban and his wife Patricia claimed an operating loss in the amount of $9,976 and an investment tax and business energy credit in the amount of $21,584.[8] The Kalibans also claimed an operating loss from Poly Reclamation on their 1982 return in the amount of $409. Respondent disallowed the Kalibans' claimed operating losses and credits related to Poly Reclamation in full.

Kaliban learned of the Plastics Recycling transactions and Poly Reclamation from Alter and Feinstein. He understood that members of Shea & Gould had looked into PI and that some of them, including Alter, were investing in the Plastics Recycling transactions. Alter did not hold himself out as a plastics expert, but Kaliban claims that he understood that Alter had spoken to a member of Shea & Gould who apparently had been

[8] On their 1981 return, the Kalibans claimed a total of $21,797 in credits.

involved in a plastics company. Kaliban did not read the Poly Reclamation offering memorandum or otherwise investigate or analyze any aspect of the transactions. He assumed that if Alter was investing in the Plastics Recycling transactions, it was a good investment.

## 2. Steve and Lispet Roland

Petitioners Steve and Lispet Roland resided in New York, New York, when their petition was filed. After graduating from high school, Steve Roland (Roland) pursued dramatic training for 2 years and then served in the Army. Upon completing his military service, Roland performed on Broadway, in night clubs, and on radio. His career eventually shifted to the commercial field where he engaged in on camera performances and then concentrated in voice-over work. Roland's workload and earnings grew quickly, and in 1968 he retained Alter's firm to manage his finances and plan for taxes. Alter and Feinstein received Roland's income and paid his bills, such as his agent's commissions, maintained books tracking Roland's investments and residuals, and prepared the Rolands' tax returns. They also reviewed investments that had been suggested to Roland by others. Roland incorporated his professional services under the name Steve Roland, Inc. (SRI) in 1968. SRI, whose only asset was its arrangement for the services of Roland, filed a separate return from him. Prior to 1981, Roland invested in a profitable commercial real estate venture in which Alter also invested. On their joint 1981 Federal Income

tax return, the Rolands reported gross income from wages, interest, dividends, State and local tax refunds, and capital gains in excess of $236,000.

Roland acquired a 1.547-percent interest in Poly Reclamation for $12,500 in 1981. As a result of the investment in Poly Reclamation, on their 1981 Federal income tax return the Rolands claimed an operating loss in the amount of $9,977 and an investment tax and business energy credit in the amount of $21,584. Respondent disallowed the Rolands' claimed operating losses and credits related to Poly Reclamation in full.

Roland learned of the Plastics Recycling transactions and Poly Reclamation from Alter. Alter told Roland that he and others at Shea & Gould were investing in a Plastics Recycling transaction and that Roland could participate as well if he wished. Roland discussed the Plastics Recycling transactions with Alter and Feinstein. He understood that Feinstein had conducted most of the research into the Plastics Recycling transactions, but at trial Roland could not recall what research Feinstein had done. Roland did not know and did not ask what the assets of Poly Reclamation were. At trial, he could not recall who manufactured the Sentinel recyclers or whether Feinstein or Alter had investigated suitable end-users for the machines or had inquired about existing competition. Roland did not read the Poly Reclamation offering memorandum or otherwise learn about the investment apart from discussing it with Alter and Feinstein. He

explained that he believed that if Alter and other members of Shea & Gould were investing in a Plastics Recycling transaction, then he should too.

### 3. Karl and Marjorie Weber

Petitioners Karl and Marjorie Weber resided in Fort Meyers, Florida, when their petition was filed. Both of the Webers died prior to the trial of their case. The executor of their estates, Alter, testified on their behalf.

Each Weber earned a college degree. Karl became a successful voice-over performer and a member of the board of directors of the Screen Actors Guild, and Marjorie managed their finances. They met Alter in approximately 1969 or 1970 and retained his firm to prepare their tax returns and provide other tax services. Feinstein handled their tax matters and met with the Webers approximately four times a year. Alter represented the Webers in some real estate transactions, and Feinstein on occasion reviewed investments that had been suggested to them by others. Prior to 1981, Alter and the Webers both invested in a successful nursing home venture. On their joint 1981 Federal Income tax return, the Webers reported gross income from wages, interest, dividends, and capital gains in excess of $221,000.

The Webers acquired a 1.547-percent interest in Clearwater for $12,500 in 1981.[9] As a result of their investment in

---

[9] The parties stipulated that the Webers owned a one-quarter
(continued...)

Clearwater, on their 1981 Federal income tax return the Webers claimed an operating loss in the amount of $10,002 and an investment tax and business energy credit in the amount of $21,584.[10]  Respondent disallowed the Webers' claimed operating losses and credits related to Clearwater in full.

Alter introduced the Plastics Recycling transactions and Clearwater to the Webers in 1981.  As he recalled:  "I informed them of its availability and told them that I was investing in it and if they were interested they could participate as well."  The Webers decided to invest in Clearwater after discussing it with Alter and Feinstein.  Alter specifically recalled that he explained to the Webers the nature of the investment and what might come out of this investment.  Aside from speaking with Alter, the Webers did not conduct any personal investigation with respect to Clearwater.

---

[9](...continued)
interest in the profits, losses, and capital of Clearwater during taxable year 1981.  However, in their petition, the Webers stated that they owned a one-quarter interest in a partnership unit, and several of the 1981 Schedules K-1, Partner's Share of Income, Credits, Deductions, etc. attached to Clearwater's 1981 partnership return (the Webers' 1981 Schedule K-1 was not among them), indicate that an investment of $12,500 yielded a 1.547-percent interest in Clearwater.

[10]    On their 1981 return, the Webers claimed total credits in the amount of $21,655.

4.  Lionel and Betty Zimmer

Petitioners Lionel and Betty Zimmer resided in New York, New York, when their petitions were filed.  Lionel Zimmer (Zimmer) earned a B.A. degree in political science from the University of North Carolina (UNC).  While pursuing his undergraduate degree, Zimmer joined the Naval ROTC, was commissioned, placed on active duty, and served overseas.  After completing his military service Zimmer returned to UNC to finish his degree and then moved to Los Angeles and worked for 2-1/2 years as a disk jockey at a radio station.  Then he went to Paris in 1949 to attend a film school.  Upon learning that the film school was not covered by the GI Bill, Zimmer enrolled in a language school to learn French.  After several months he transferred to the Sorbonne and began a course in French civilization.

Zimmer also pursued work as an actor in Paris.  When his career quickly flourished, he ended his schooling.  Zimmer worked as master of ceremonies of a radio program that was broadcast weekly to the United States, worked with Orson Welles for much of a year, and worked on a few movies.  At the end of 1951 Zimmer moved back to the United States and became a staff announcer in Hollywood for the American Broadcasting Company (ABC).  Nine years later he left ABC and began freelancing.  In 1967 he moved to New York City and performed voice-overs for commercials.  He became active in the Screen Actors Guild and was elected to its board of directors.

Zimmer met Alter through the Screen Actors Guild.  He was impressed with Alter's work and retained his firm in approximately 1970 to manage his finances.  Alter's firm deposited Zimmer's receipts into various accounts and oversaw the payment of his bills.  Feinstein prepared the Zimmers' tax returns and on occasion reviewed tax shelters and other investments that had been suggested to Zimmer by others.[11] Zimmer met with Feinstein on a weekly basis and met with Alter several times each year.  Alter rarely recommended investments to Zimmer.  Zimmer recalled making just one investment involving Alter prior to 1981.  They both invested in a profitable commercial real estate venture.  On their joint 1981 Federal Income tax return, the Zimmers reported gross income from wages, interest, dividends, State and local tax refunds, and capital gains in excess of $139,500.

Zimmer acquired a 1.547-percent interest in Poly Reclamation for $12,500 in 1981.  As a result of his investment in Poly Reclamation, on their 1981 Federal income tax return the Zimmers claimed an operating loss in the amount of $9,976 and an investment tax and business energy credit in the amount of $21,584.  The Zimmers also claimed an operating loss from Poly

_____

[11]   Zimmer recalled:  "I used to belong to a men's club at the Vanderbilt YMCA and there was a chap there that used to sell tax shelters, investments.  He was always telling me I was a damn fool, why don't you buy something, why don't you take advantage of these things."

Reclamation on their 1982 return in the amount of $409. Respondent disallowed the Zimmers' claimed operating losses and credits related to Poly Reclamation in full.

Zimmer learned of the Plastics Recycling transactions and Poly Reclamation at a meeting with Alter and Feinstein. Alter and Feinstein explained the transactions to him. Zimmer recalled that Alter and/or Feinstein had investigated the Plastics Recycling transactions and PI, and had inspected the recyclers. He understood that the investment would generate additional tax credits because it purportedly saved energy. However, Zimmer could not recall learning about the relationship between the price of oil and the value of the recycled pellets. He was encouraged that Alter and other members of Shea & Gould were investing in a Plastics Recycling transaction.

Zimmer never read the Poly Reclamation offering memorandum and never asked to see it. He claims that he expected to receive royalty payments, but he did not independently investigate whether the recycled pellets had any value. When asked if he was aware that the first-year tax benefits would exceed the amount of his investment, Zimmer stated: "I don't know that I was aware of that. Yes, I am now. I knew it had a certain advantage. The monetary, I honestly--it never made any impression upon me. No one--if it was explained to me, it went by me, it went over my head." Zimmer decided to invest in Poly Reclamation based on his meeting with Alter and Feinstein. He recalled receiving progress

reports regarding Poly Reclamation from Alter's office.  As he recalled:  "To be honest with you, I didn't pay that much attention to anything I got but I know that I got very infrequent reports * * *.  It was minuscule."

OPINION

We have decided a large number of the Plastics Recycling group of cases.  Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.  See also Sann v. Commissioner, T.C. Memo 1997-259 and cases cited therein.  The majority of these cases, like the present cases, raised issues regarding additions to tax for negligence and valuation overstatement.  We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues.

In Provizer v. Commissioner, supra, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated

transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, the Clearwater transaction was considered in Provizer v. Commissioner, supra, and petitioners Kaliban, Roland, and Zimmer each stipulated that the Poly Reclamation transaction is substantially identical to the Clearwater transaction. The underlying transactions in these cases, and the Sentinel EPE recyclers purportedly leased by the Partnerships, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the stipulations of settled issues filed shortly before trial. The records plainly support respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the

applicable law in a substantially identical case that also involved Clearwater, see Provizer v. Commissioner, supra.

A.  Section 6653(a)--Negligence

In notices of deficiency, respondent determined that each of petitioners was liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1981, and that petitioners Kaliban and Zimmer were liable for the negligence additions to tax for 1982.[12]  Petitioners have the burden of proving that respondent's determinations of these additions to tax are erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations.  Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The question is whether a particular taxpayer's actions

---

[12]   As noted, in all but one of the notices of deficiency respondent referred to sec. 6653(a)(1)(A) and (B).  During 1981 and 1982, the negligence additions to tax were provided for under sec. 6653(a)(1) and (2).

in connection with the transactions were reasonable in light of his experience and the nature of the investment or business.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).  When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment.  McPike v. Commissioner, T.C. Memo. 1996-46.  Compare Spears v. Commissioner, T.C. Memo. 1996-341 with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners maintain that they were reasonable in claiming deductions and credits with respect to the Partnerships.  They argue that they expected an economic profit in light of the so-called oil crisis in the United States in 1981 and that they reasonably relied upon Alter and Feinstein as qualified advisers on this matter.

### 1.  The So-Called Oil Crisis

Petitioners in their posttrial briefs each contend that they reasonably expected to make an economic profit from the Partnerships because plastic is an oil derivative and the United States was experiencing a so-called oil crisis during the year 1981.  Based upon our review of the records, we find petitioners' claims unconvincing, regardless of the so-called oil crisis.  Moreover, testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment

credits and purported losses based on vastly exaggerated valuations of recycling machinery.

Petitioners did not educate themselves in, or personally investigate, the Plastics Recycling transactions. They did nothing more than discuss the transactions with Alter and Feinstein. Petitioners did not even read the offering materials. Asked during his direct examination if he had any recollection of the relationship between the projected profitability of Poly Reclamation and the price of oil, and whether it was described to him by Alter and Feinstein, Zimmer replied: "I don't believe so." Based upon the records in these cases, we are not convinced that petitioners gave due consideration to any business aspects of the Partnerships. Petitioners have failed to show that they intended and reasonably expected to make an economic profit from the transactions, except from tax benefits.

Moreover, petitioners did not adequately explain how the so-called oil crisis provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits. Although petitioners chose not to read them, the offering memoranda warned that there could be no assurances that prices for new resin pellets would remain at their then-current level. Also, one of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil. In his report, he stated that less than 10 percent of crude oil is utilized for making plastics

materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." Furthermore, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of these cases. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. In the present cases, however, as explained by respondent's expert Steven Grossman, the price of plastics materials was not directly proportional to the price of oil, and there is no

persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decisions to invest. While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

In addition, the taxpayers in the Krause case were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present cases, petitioners were not experienced or educated in plastics recycling, and they did not independently investigate the Sentinel recyclers or hire an expert in plastics to evaluate the Partnership transactions. We consider petitioners' arguments with respect to the Krause case inapplicable.

### 2. Petitioners' Purported Reliance on Advisers

Petitioners contend that they reasonably relied upon Alter and Feinstein as qualified advisers on this matter.

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice.  United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Buck v. Commissioner, T.C. Memo. 1997-191; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also Friedman v. Commissioner, T.C. Memo. 1996-558; Gollin v. Commissioner, T.C. Memo. 1996-454; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  Goldman v. Commissioner, supra; Pasternak v.

- 34 -

Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v.
Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94
T.C. 637, 652-653 (1990), affd. without published opinion 956
F.2d 274 (9th Cir. 1992), affd. without published opinion sub
nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991);
Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd.
without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary
v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner,
91 T.C. 524, 565 (1988).  Pleas of reliance have been rejected
when neither the taxpayer nor the advisers purportedly relied
upon by the taxpayer knew anything about the nontax business
aspects of the contemplated venture.  David v. Commissioner,
supra, Goldman v. Commissioner, supra; Freytag v. Commissioner,
supra; Beck v. Commissioner, 85 T.C. 557 (1985); Buck v.
Commissioner, supra; Lax v. Commissioner, T.C. Memo. 1994-329,
affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Sacks
v. Commissioner, supra; Steerman v. Commissioner, T.C. Memo.
1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619; see Sann
v. Commissioner, T.C. Memo. 1997-259 and the Plastics Recycling
cases cited therein.

Alter and Feinstein did not actively seek prospective
investments for petitioners.  In addition to legal services, they
provided a bookkeeping and cash management service.  They
received  petitioners' income and paid their bills (except for
the Webers) and provided periodic financial statements.

Feinstein also prepared all of petitioners' tax returns. Alter explained his and Feinstein's limited involvement in petitioners' investment activity as follows:

> The clients in almost all cases when they had an investment proposal presented to them asked for our opinion as to its validity and merit, and to the extent that we were able to give advice, we gave advice.
>
> * * * * * * *
>
> Of course you should understand that many of these clients were high income performers. They had presented to them very frequently from other performers proposals that involved * * * tax shelters, and they brought them into our office for review.
> Under my review or at my direction, <u>Mr. Feinstein reviewed these proposals</u> and they involved all sorts of * * * tax shelters and invariably these proposals were rejected as being without merit. [Emphasis added.]

Feinstein explained that petitioners "would come in and say, I spoke with so-and-so, he's got a terrific thing that was going to make a lot of money or something and why don't you find out something about it and let us know--let me know what you find out."

Alter mentioned a few investments to petitioners for their consideration, such as the Plastics Recycling transactions. He did not, however, recommend that petitioners invest in the Partnerships. Asked if, "in connection with the making of this investment yourself, and in recommending" the investment to his clients, he earned a commission, Alter replied: "No, I did not, <u>and I would like to correct your use of the word 'recommend.'</u> I told them I was going into it and it seemed sound, and if they

were interested they could participate as well." (Emphasis added.) Alter reiterated this point on cross-examination in the following exchange:

Q Did you suggest that your clients consult with others who were plastics experts?

A No. I told them that I was investing and that it seemed like a sound investment to me, and if they were interested they could participate as well.

Q Did you recommend the investment?

A To the extent that I just stated.

Feinstein recalled Alter's presentation of the transactions as follows: "It is my recollection and based on how I was and he was with clients, that it was a possible investment. He thought it would work for them and would work as an investment with no-- no pressure at all. * * * Most certainly not pressure." With respect to what Feinstein himself advised petitioners, Feinstein could not recall if he was asked for a recommendation, and could only venture that "I probably would have said that it's--it's a type of situation".[13]

Petitioners maintain that they reasonably inferred that Alter's personal decision to invest was a tacit recommendation of the Plastics Recycling transactions, particularly given his history of rejecting tax shelters that had been suggested to them

---

[13] In answers to interrogatories, incorporated into a stipulation, petitioner Zimmer indicated that in his view Alter and Feinstein had recommended the Plastics Recycling investment to him. The testimony of Alter and Feinstein clarifies this limited and qualified stipulation.

by others.  However, petitioners failed to take adequately into account Alter's lack of education and experience in plastics materials and plastics recycling, and the limited nature of his investigation of the Plastics Recycling transactions.  Moreover, it was Feinstein who reviewed the other tax shelters for petitioners, not Alter, and Feinstein was primarily responsible for reviewing the Plastics Recycling transactions.  Petitioners were well aware that Feinstein handled such work for Alter.  In their posttrial briefs, petitioners state that they "came to value Feinstein's wisdom and ability to analyze financial data and appraise the economic potential of a prospective investment."  Unlike Alter, however, Feinstein did not invest in the Plastics Recycling transactions.  In any event, under the circumstances of these cases, petitioners' characterization of how Alter and/or Feinstein presented the Plastics Recycling transactions to them is not dispositive of the issue.  See Buck v. Commissioner, T.C. Memo. 1997-191.

Alter and Feinstein conducted a limited investigation of the Plastics Recycling transactions.  Alter read the offering materials, discussed the investment with others at Shea & Gould, and spoke to Winer.  The colleagues he spoke to included Hirshfield, Carroll, Parker, and Ferraro, but he primarily relied upon Feinstein, in whom Alter indicated he reposed particular confidence based upon their long professional association.  Alter recalled the investigation by his colleagues at Shea & Gould in

general terms, and portions of his testimony were different from Feinstein's recollection of events. For example, Alter testified that he asked Feinstein to speak with Parker, but Feinstein testified that Parker "didn't speak to me." Also, Alter was under the impression that "Feinstein's friend" (Lauren) had read the Poly Reclamation offering memorandum, but Feinstein testified that Lauren had not seen an offering memorandum. With respect to Winer, Alter believed that he indicated that end-users had been scheduled for the machines, but Winer did not name the end-users.

Alter accepted at face value all of the representations made in the offering materials, including the value of the Sentinel EPE recycler. During the course of his testimony, he was asked what made the Sentinel EPE recycler unique. He replied:

> Again, I'm not an expert in the industry. I believe the representation was that they had a special fluid cooling process that was not available elsewhere. They made the representations that it had a dual set of blades, I believe, rotary blades, exterior rotary blade[s] as well as the interior blades, that would crush the plastic material more effectively.

In Provizer v. Commissioner, T.C. Memo. 1992-177, PI's vice president of manufacturing and a developer of PI's prototype recycler, William Strlzelewicz,

> explained that the coolant used in the process was plain water and not some "trade secret" chemical compound. End-users stated that a usual method by which the water might be "injected" was for a factory worker to dump it on the heated material.

Asked what he did to confirm the value of the machine, Alter testified: "I had no competence to do that, to do any

comparison."  Alter did not hire an expert to value the Sentinel EPE recycler, and he knew that Feinstein and Lauren had not made a judgment as to the value of the machine.

Feinstein's investigation of the Plastics Recycling transactions was similarly limited.  He spoke with Lauren, who may have had some insight into plastics materials, but Feinstein only asked Lauren about PI's reputation.  Feinstein did not provide Lauren with a copy of an offering memorandum, or ask him about the prospects for a Sentinel EPE recycler, or inquire as to whether there were any competing machines already on the market. He accepted the purported value of the Sentinel EPE recycler after speaking with a friend and associate "about pricing and how things are priced in * * * [the plastics] industry."  The friend and associate--unidentified by Feinstein--did nothing more than confirm that the stream-of-income method of valuation was commonly used.  Feinstein did not verify any of the underlying assumptions upon which the income projections in the offering materials were based.

Neither Feinstein nor Lauren visited PI to see a Sentinel EPE recycler, or investigated whether competitive machines existed, or made a judgment as to the value of the machine. Feinstein testified that he had telephone conversations with Winer, but Feinstein did not explain the substance of Winer's comments.  See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531; Patin v. Commissioner, 88

T.C. 1086, 1131 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), sustaining negligence determinations despite claims by taxpayers that they relied on advisers, where such advisers lacked relevant expertise or knowledge of underlying transactions.  Feinstein claimed that he came to a positive conclusion with respect to the soundness of the Plastics Recycling transactions, and that he communicated this conclusion to Alter.  However, Feinstein did not personally invest in a Plastics Recycling transaction; nor did his friend Lauren.  In the end, Alter and Feinstein relied on the offering materials and representations by insiders for the value of the machines and the economic viability of the Plastics Recycling transactions.  See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."

We hold that petitioners' purported reliance on Alter and Feinstein was not reasonable, not in good faith, nor based upon full disclosure.  Petitioners' testimony in these cases was self-serving and in significant respects not credible, and this Court is not required to accept it as true.  Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski

v. Commissioner, 87 T.C. 74, 77 (1986); Snyder v. Commissioner, T.C. Memo. 1995-285; Sacks v. Commissioner, T.C. Memo. 1994-217. We find petitioners' claims of financial naivete and ignorance, particularly with respect to the nature and amount of the tax benefits, disingenuous.[14]  The direct reductions claimed on petitioners' 1981 tax returns, from the investment tax credits alone, equaled 173 percent of their cash investments.  Therefore, like the taxpayers in Provizer v. Commissioner, supra, "except for a few weeks at the beginning, petitioners [Kaliban, Roland, Weber, and Zimmer] never had any money in the * * * [Partnership transactions]."  A reasonably prudent person would have asked a qualified adviser if such a windfall were not too good to be true.  McCrary v. Commissioner, 92 T.C. at 850.

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was reflected in the offering memoranda.  Petitioners chose not to read the offering materials, but Alter and Feinstein did read them.  Certainly Feinstein recognized and understood the nature of the tax benefits, and he discussed it with Alter.  Together they met with each of petitioners and, as Feinstein recalled:

---

[14]    In their posttrial briefs, petitioners claim that they "had no knowledge of the extent of the tax benefits available to investors in" the Partnerships or that "the tax benefits in the first year would exceed" their respective investments.  However, the majority of the previous investments they had asked Alter and Feinstein to review, if not all of them, were tax shelters.  The notion that Alter and Feinstein failed to highlight the amounts of the tax benefits generated by the Partnerships is incredible.

"touched on what we had all learned about the background of the people, what I had learned by my discussions with people, what the other partners had learned about the venture and conveyed to me." As a result of these meetings, petitioners learned about the nature of the tax benefits, as well as Alter's and Feinstein's reliance on the offering materials and representations by insiders for the value of the machines and the economic viability of the Plastics Recycling transactions.

Neither Alter nor Feinstein had any expertise or experience in plastics materials or plastics recycling, and petitioners had no reason to believe otherwise. Alter had no competence to value the machines, and neither he nor Feinstein independently confirmed their value or the economic viability of the Plastics Recycling transactions. The records in these cases show that petitioners clearly possessed the intelligence and background to recognize that further investigation was required. A taxpayer may rely upon his adviser's expertise, but it is not reasonable or prudent for a taxpayer to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, 43 F.3d at 789-790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, supra; Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, supra; Rogers v. Commissioner, T.C. Memo. 1990-619.

3.  Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and up to 1982 was not in excess of $50,000.  Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler having a value of $1,162,666.  In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates.  Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the * * * [recyclers] by the owners."  Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000.  However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981.

We accord no weight to the Carmagnola reports submitted by petitioners.  The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author.  In one

preliminary report, Carmagnola states that he has "a serious concern of actual profit" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, counsel for petitioners obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns. Not surprisingly, petitioners' counsel did not call Carmagnola to testify in these cases, but preferred instead to rely solely upon his preliminary ill-founded valuation estimates. (Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.) The Carmagnola reports were a part of the record considered by this Court and reviewed by the Court of Appeals for the Sixth Circuit in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no

consequence.  Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners also submitted several documents into the records of their cases as evidence that they monitored their investments.  Of those documents, just one concerned Poly Reclamation and none concerned Clearwater.  The one that concerned Poly Reclamation, dated September 30, 1982, indicated that three of its Sentinel EPE recyclers had been placed and were running.[15]  The remaining documents included two financial statements for another Plastics Recycling partnership, Stevens Recycling Associates (Stevens), for the years ended 1982, 1983, and 1984; two reports regarding the placement of the Sentinel EPS recyclers owned by Stevens; and an August 29, 1985, letter that discussed "the impossible pricing situation that continues in the polystyrene market."  On the subject of the progress reports, Zimmer testified:  "To be honest with you, I didn't pay that much attention to anything I got but I know that I got very infrequent reports * * *.  It was minuscule."  We are not convinced from the lone Poly Reclamation progress report that petitioners monitored or took an active interest in their investments in the

---

[15]    The Sept. 30, 1982 update concerning Poly Reclamation was not made a part of the record in docket No. 10802-89 (the Weber case).

Partnerships, particularly in view of their lack of effort to learn about or independently investigate the Plastics Recycling transactions prior to investing in them.

Petitioners cite a number of cases in support of their positions, but primarily rely on Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), affg. in part and revg. in part without published opinion Osterhout v. Commissioner, T.C. Memo. 1993-251; Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228; Wright v. Commissioner, T.C. Memo. 1994-288; Wood v. Commissioner, T.C. Memo. 1991-205; Davis v. Commissioner, T.C. Memo. 1989-607; Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993).

Petitioners' reliance on the Wright, Wood, and Davis cases, wherein this Court declined to sustain the negligence additions to tax, is misplaced. In the Wright case, the taxpayers, who suddenly had acquired wealth after a lifetime of modest earnings, relied upon a well-recommended financial planner who expressly recommended the subject investment as part of an overall plan that included a variety of investments. The taxpayers reviewed the offering memorandum and were advised that the investment partnership already had been audited by the IRS and that the

audit had resulted in no change.  They agreed to the overall plan with the objective of making a profit and personally monitored the investment.  In Wood, a group of consolidated cases, a financial planner recommended the investment, all of the taxpayers had profit objectives, the transactions were not sham transactions, and one pair of taxpayers inspected the equipment at issue.  In the Davis case, the taxpayers relied in part upon the express recommendation of a "trusted and long-term adviser", and in part upon their review of the offering materials, which did not reflect that the principals in the venture lacked experience in the pertinent line of business.

The facts of petitioners' cases differ in several key respects from the Wright, Wood, and Davis cases.  Unlike the Wright and Wood cases, petitioners' purported advisers were not financial planners actively seeking out investment opportunities for them.  In contrast to all three cases, petitioners' purported advisers did not expressly recommend that they invest in the Partnerships.  Also, none of petitioners read the offering memoranda, saw a Sentinel EPE recycler, or made any effort to learn about the Plastics Recycling transactions beyond discussing them with Alter and Feinstein.  In addition, the Partnership transactions are shams lacking economic substance, and we are not convinced that any of petitioners had an honest objective of

making an economic profit.  Accordingly, we consider petitioners'
reliance on the Wright, Wood, and Davis cases misplaced.

In Mollen v. United States, supra, the taxpayer was a
medical doctor who specialized in diabetes and who, on behalf of
the Arizona Medical Association, led a continuing medical
education (CME) accreditation program for local hospitals.  The
underlying tax matter involved the taxpayer's investment in
Diabetics CME Group, Ltd., a limited partnership that invested in
the production, marketing, and distribution of medical
educational video tapes.  The District Court found that the
taxpayer's personal expertise and insight in the underlying
investment gave him reason to believe it would be economically
profitable.  Although the taxpayer was not experienced in
business or tax matters, he did consult with an accountant and a
tax lawyer regarding those matters.  Moreover, the District Court
noted that the propriety of the taxpayer's disallowed deduction
therein was "reasonably debatable."  Id. at 93-6447, 93-2 USTC
par. 50,585, at 89,895; see Zfass v. Commissioner, T.C. Memo.
1996-167.

In contrast, in these cases neither petitioners nor their
purported advisers had any personal insight or industry know-how
in plastics recycling that would reasonably lead them to believe
that the Plastics Recycling transactions would be economically

profitable.[16]  Feinstein spoke to Lauren, but their discussion was limited to Lauren's impression of PI.  Lauren did not read an offering memorandum, see a Sentinel EPE recycler, or do any type of investigation into the plastics recycling market.  Neither petitioners nor their purported advisers hired any independent experts in the field of plastic materials or plastics recycling.  They relied upon the offering materials and representations by insiders to the Plastics Recycling transactions.  Accordingly, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, supra, is misplaced.  In Osterhout, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained the Commissioner's imposition of the negligence additions to tax with respect to one of the partners therein.[17]  The Court of Appeals for the Ninth Circuit reversed

---

[16]     Alter claimed that he spoke to Ferraro, who apparently worked for one or more summers at a plastics company, and Carroll, who purportedly had an engineering background.  However, neither Ferraro nor Carroll testified in these cases, and the records fail to establish that they were qualified to analyze the Sentinel EPE recycler or the Plastics Recycling transactions. Further, Feinstein testified that he did not believe Ferraro or any of the other members of Shea & Gould that he spoke with had any education or experience in the plastics industry.

[17]     Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in
                                                    (continued...)

our imposition of the negligence additions to tax.  Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.  However, none of petitioners in the cases before us read the Poly Reclamation or Clearwater offering memoranda, let alone the tax opinions appended thereto.

Moreover, the offering memoranda for the Partnerships herein warned prospective investors that the accompanying tax opinion letters were not in final form, and were prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the Partnerships.  The tax opinion letters accompanying the Clearwater and Poly Reclamation offering memoranda were addressed solely to the general partner and began with the following opening disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>.  <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with their investment in the Partnership and the operations thereof.  We recognize that you intend to include this

---

[17](...continued)
part and revd. in part without published opinion sub nom. <u>Balboa Energy Fund 1981 v. Commissioner</u>, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia.  Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

> letter with your offering materials and we have
> consented to that with the understanding that <u>the
> purpose in distributing it is</u> to assist your offerees'
> tax advisors in making their own analysis and <u>not to
> permit any prospective investor to rely upon our advice
> in this matter</u>.  [Emphasis added.]

Accordingly, the tax opinion letters expressly indicated that prospective investors such as petitioners were not to rely upon the tax opinion letter.  See <u>Collins v. Commissioner</u>, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217.  The limited, technical opinion of tax counsel expressed in these letters was not designed as advice upon which taxpayers might rely, and the opinion of counsel itself so states.

Petitioners' reliance on the <u>Durrett</u> and <u>Chamberlain</u> cases is also misplaced.  In those cases, the Court of Appeals for the Fifth Circuit reversed this Court's imposition of the negligence additions to tax in two nonplastics recycling cases.  The taxpayers in the <u>Durrett</u> and <u>Chamberlain</u> cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts.  In the <u>Durrett</u> and <u>Chamberlain</u> cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters.  In other First Western cases, however, the Courts of Appeals have affirmed decisions of the Tax Court imposing negligence additions to tax.

See Foulds v. Commissioner, T.C. Memo. 1994-489 (the well-educated taxpayer failed to establish the substance of advice, and the purported adviser lacked tax expertise), affd. without published opinion 94 F.3d 651 (9th Cir. 1996); Chakales v. Commissioner, T.C. Memo. 1994-408 (reliance on a long-term adviser, who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430 (reliance on an adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Freytag v. Commissioner, 89 T.C. at 849 (reliance on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions).  The records in the cases before us establish that Alter and Feinstein did not possess sufficient knowledge of the plastics or recycling industries to render a competent opinion.[18]  See Friedman v. Commissioner, T.C. Memo. 1996-558.

---

[18]   This fact has been deemed relevant by the Court of Appeals for the Second Circuit.  See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995) (taxpayers' reliance on expert advice not reasonable where expert lacks knowledge of business in which taxpayers invested), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) (same), affg. T.C. Memo. 1993-480.  The Court of Appeals for the Second Circuit is
(continued...)

Accordingly, petitioners will not be relieved of the negligence additions to tax based upon the decisions in the Durrett and Chamberlain cases by the Court of Appeals for the Fifth Circuit.

### 4. Conclusion as to Negligence

Under the circumstances of these consolidated cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their Federal income tax returns.  Petitioners did not read the offering materials or otherwise learn about or independently investigate the Plastics Recycling transactions aside from speaking with Alter and Feinstein.  Alter and Feinstein are not investment planners and they did not perform such services for petitioners.  Petitioners' purported advisers had no education or experience in plastics materials or plastics recycling and ultimately relied upon the offering materials with respect to the capabilities and market demand for the machines.  We hold that petitioners did not reasonably rely upon Alter and Feinstein. The records in these cases indicate that Alter and Feinstein knew that the tax benefits were contingent upon the purported value of the Sentinel EPE recycler, and that they explained all that they had learned to petitioners.  Yet neither petitioners nor their

---

[18](...continued)
the court to which appeal in the Kaliban, Roland, and Zimmer cases lies.  See Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

purported advisers in good faith investigated the fair market value of a Sentinel EPE recycler, or the underlying viability, financial structure, and economics of the Partnership transactions. We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2) for the taxable years at issue. Respondent is sustained on this issue.

B.  Section 6659--Valuation Overstatement

In the notices of deficiency for 1981, respondent determined that petitioners were each liable for the section 6659 addition to tax on the portions of their respective underpayments attributable to valuation overstatement. Petitioners have the burden of proving that respondent's determinations of the section 6659 additions to tax in their cases are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. at 860-861.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits and business energy credits, based on purported values of $1,162,666 for each Sentinel EPE recycler. Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the tax benefits claimed with respect to the Partnerships.

Petitioners contend that section 6659 does not apply in their cases for the following three reasons: (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; (2) petitioners' concessions of the claimed tax benefits preclude imposition of the section 6659 additions to tax; and (3) respondent erroneously failed to waive the section 6659 additions to tax. We reject each of these arguments for reasons set forth below.

1. The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See McCrary v. Commissioner, 92 T.C. at 827; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To the extent taxpayers claim tax benefits that are disallowed on grounds

separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. Krause v. Commissioner, 99 T.C. at 178 (citing Todd v. Commissioner, supra). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (the section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement. According to petitioners, the tax benefits were disallowed because the Partnership transactions lacked economic substance, not because of any valuation overstatements. It follows, petitioners reason, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiencies. Petitioners cite the following cases to support this argument: Heasley v.

Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra; and Todd v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding herein that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Petitioners argue that in Provizer v. Commissioner, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation reported in that case. According to petitioners, the purported value of the recyclers in the Clearwater transaction was predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayers' valuation method. Petitioners misread and distort our Provizer opinion. In the Provizer case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their

efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Likewise, overvaluation of the Sentinel EPE recyclers in these cases is the ground for our holding herein that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was recently rejected in Gilman v. Commissioner, supra, by the Court of Appeals for the Second Circuit. In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance. The taxpayers therein, citing Todd v. Commissioner, supra, and Heasley v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation. The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment contributed directly to this Court's earlier conclusion that the transaction lacked economic substance and was a sham. Gilman v. Commissioner, supra at 151. In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'"

Id. at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. at 566-567; Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, supra, Todd v. Commissioner, supra, and McCrary v. Commissioner, 92 T.C. at 827, is misplaced. In those cases, in contrast to the consolidated cases herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluations were not the grounds on which the taxpayers' liability was sustained. In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." McCrary v. Commissioner, supra at 859. Petitioners' cases present just such a "different situation": overvaluation of the recyclers was integral to and

inseparable from petitioners' claimed tax benefits and our holding that the Partnership transactions lacked economic substance.[19]

### 2. Concession of the Deficiencies

Petitioners argue that their concessions of the deficiencies preclude imposition of the section 6659 additions to tax. Petitioners contend that their concessions render any inquiry into the grounds for such deficiencies moot. Absent such inquiry, petitioners argue that it cannot be known whether their underpayments were attributable to a valuation overstatement or another discrepancy. Without a finding that a valuation overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply. In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990) and McCrary v. Commissioner, supra.

---

[19] To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable. To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed. See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement), affg. T.C. Memo. 1989-684.

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854 n.14. The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the Partnership transactions lacked economic substance. Regardless of petitioners' concessions, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. Dybsand v. Commissioner, supra. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d at 228; Irom

v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the claimed investment tax credits and other tax benefits related to anything other than a valuation overstatement.  To the contrary, petitioners each stipulated substantially the same facts concerning the Partnership transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177.  In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers.  The overvaluation of the recyclers, exceeding 2,325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance.  Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Petitioners reliance on McCrary v. Commissioner, supra, is misplaced.  In that case, the taxpayers conceded disentitlement to their claimed tax benefits and the section 6659 addition to tax was held inapplicable.  However, the taxpayers' concession of

the claimed tax benefits, in and of itself, did not preclude imposition of the section 6659 addition to tax.  In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease.  In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers. We hold that petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[20]

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000.  Our finding in Provizer that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance.  Petitioners stipulated that the Partnership transactions were similar to the Clearwater transaction described in the Provizer case, and that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.  Given those concessions, and the fact that the records here plainly show that the overvaluations of the

---

[20]    Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate.  That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession.  Moreover, see supra note 19 to the effect that the Court of Appeals for the Second Circuit and this Court have not followed the Heasley opinion with respect to the application of sec. 6659.

recyclers was the only reason for the disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

### 3.  Section 6659(e)

Petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax.  Section 6659(e) authorizes the Commissioner to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith.  The Commissioner's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. at 179.  Abuse of discretion has been found in situations where the Commissioner's refusal to exercise discretion is arbitrary, capricious, or unreasonable.  See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

We note initially that petitioners did not request respondent to waive the section 6659 additions to tax until well after the trials of these cases.  Petitioners each made their requests approximately 4 months after the trials of their cases. We are reluctant to find that respondent abused discretion in these cases when respondent was not timely requested to exercise

it and there is no direct evidence of any abuse of administrative discretion.  Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request waivers, but instead we have considered the issue on its merits.  Petitioners urge that they relied on Alter and Feinstein in deciding on the valuation claimed on their tax returns.  Petitioners contend that such reliance was reasonable, and, therefore, that respondent should have waived the section 6659 additions to tax.[21]  However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioners' purported reliance on Alter and Feinstein under the circumstances here was not reasonable.

Neither Alter nor Feinstein had any education or experience in plastics materials or plastics recycling.  They did not visit PI or see a Sentinel EPE recycler or any competing machines in their review of the transactions.  Alter acknowledged that he had no competence to confirm the value of the Sentinel EPE recycler or to conduct a comparison, and he and Feinstein ultimately

---

[21]    In their posttrial briefs, petitioners referenced the reports prepared by Carmagnola in support of the reasonableness of the claimed valuations.  For reasons discussed supra, we consider the reports prepared by Carmagnola to be unreliable and of no consequence.

relied upon the offering memoranda for the value of the machine. In their meetings with petitioners, Alter and Feinstein explained all that they had learned of the Plastics Recycling transactions, including the nature and amounts of the tax benefits. In the end, neither petitioners nor their purported advisers in good faith investigated the fair market value of a Sentinel EPE recycler, or the underlying viability, financial structure, and economics of the Partnership transactions.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23. However, the facts in the Mauerman case are distinctly different from the facts of these cases. In Mauerman, the Court of Appeals for the Tenth Circuit held that the Commissioner had abused discretion by failing to waive a section 6661 addition to tax. Like the section 6659 addition, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In petitioners' cases, however,

particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their purported advisers.  Alter and Feinstein had no education, special qualifications, or professional skills or experience in plastics engineering, plastics recycling, or plastics materials. Consequently, we consider petitioners' reliance on the <u>Mauerman</u> case inappropriate.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships.  In these cases, respondent could find that petitioners' respective reliance on Alter and Feinstein was unreasonable.  The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position.  We hold that respondent's refusal to waive the section 6659 additions to tax in these cases is not an abuse of discretion.  Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the disallowed tax benefits.  Respondent is sustained on this issue.

<u>C.  Petitioners' Motions For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law</u>

Long after the trials of these cases, petitioners each filed a Motion For Leave To File Motion For Decision Ordering Relief

From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50.  Petitioners also lodged with the Court motions for decision ordering relief from the additions to tax for negligence and from the increased rate of interest, with attachments and memoranda in support of the motions.  Respondent filed objections, with attachments and memoranda in support thereof and petitioners thereafter filed reply memoranda.  Petitioners argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in docket Nos. 10382-86 and 10383-86, each of which was styled Miller v. Commissioner.  See Farrell v. Commissioner, T.C. Memo. 1996-295 (denying a motion similar to petitioners' motions); see also Sann v. Commissioner, T.C. Memo. 1997-259; Friedman v. Commissioner, T.C. Memo. 1996-558; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

Counsel for petitioners seek to raise a new issue long after the trials in these cases.  Resolution of such issue might well require new trials.  Such further trials "would be contrary to the established policy of this Court to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation."  Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); see also Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974).

Consequently, under the circumstances here, at this late date in the litigation proceedings, long after trial and briefing and after the issuance of numerous opinions on issues and facts closely analogous to those in these cases, petitioners' motions for leave are not well founded. Farrell v. Commissioner, supra.

Even if petitioners' motions for leave were granted, the arguments set forth in each of petitioners' motions for decision and attached memoranda, lodged with this Court, are invalid and the motions would be denied. Therefore, and for reasons set forth in more detail below, petitioners' motions for leave shall be denied.

Some of our discussion of background and circumstances underlying petitioners' motions is drawn from documents submitted by the parties and findings of this Court in two earlier decisions. See Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434. These matters are not disputed by the parties. We discuss the background matters for the sake of completeness. As we have noted, granting petitioners' motions for leave would require further proceedings.

The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements (piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases: Provizer v. Commissioner, T.C. Memo. 1992-177, and the two Miller

cases.  We held in Estate of Satin and Fisher that the terms of the piggyback agreement bound the parties to the results in all three lead cases, not just the Provizer case.  Petitioners assert that the piggyback agreement was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[22]

On or about February of 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases.  Baratelli v. Commissioner, T.C. Memo. 1994-484.  Pursuant to the offer, taxpayers had 30 days to accept the following terms:  (1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the extent of loss claimed; (2) Government concession of the substantial understatement of tax penalties under section 6661 and the negligence additions to tax under section 6653(a)(1) and (2); (3) taxpayer concession of the section 6659 addition to tax for valuation overstatement and the increased rate of interest under section 6621; and (4) execution of a closing agreement

_____

[22]    In each of their motions for decision, petitioners state: "After the lead counsel for taxpayers and Respondent had agreed upon the designation of the lead cases, Respondent's counsel prepared piggyback agreements and offered them to counsel for the taxpayers in this case and to other taxpayers."  (Emphasis added.)

(Form 906) stating the settlement and resolving the entire matter for all years.[23] Petitioners assert that the Plastics Recycling project settlement offer was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[24]

In December 1988, the Miller cases were disposed of by settlement agreement between the taxpayers and respondent.[25] This Court entered decisions based upon those settlements on December 22, 1988. The settlement provided that the taxpayers in the Miller cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the

---

[23]    The records do not include a settlement offer to petitioners. However, petitioners in each case have attached to their motions for decision a copy of a settlement offer to another taxpayer with respect to a plastics recycling case, and respondent has not disputed the accuracy of the statement of the plastics recycling settlement offer.

[24]    In each of their motions for decision, petitioners state, "Respondent formulated a standard settlement position which was extended to all taxpayers having docketed or non-docketed cases in the plastics recycling group, including Petitioner." (Emphasis added.)
    In docket No. 10802-89 (the Weber case), respondent attached to the objection to the Webers' motion for leave a copy of a Form 5402, Appeals Transmittal Memorandum and Supporting Statement, which states that the Webers refused a settlement offer with respect to Clearwater.

[25]    Although it is not otherwise a part of the records in these cases, respondent attached copies of the Miller closing agreement and disclosure waiver to respondent's objections to petitioners' motions for leave, and petitioners do not dispute the accuracy of the document.

additions to tax under the provisions of section 6661 and section 6653(a). The increased interest under section 6621(c), premised solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that time. Respondent did not notify petitioners or any other taxpayers of the disposition of the Miller cases. Estate of Satin v. Commissioner, supra; Fisher v. Commissioner, supra.

Petitioners argue that they are similarly situated to Miller, the taxpayer in the Miller cases, and that pursuant to the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in those cases. In effect, petitioners seek to resurrect the piggyback agreement offer and/or the settlement offer they previously failed to accept.

Petitioners contend that under the principle of "equality," the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference. United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973). According to petitioners, the principle of equality precludes the Commissioner from making arbitrary distinctions between like

cases.  See <u>Baker v. Commissioner</u>, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational.  While petitioners and Miller both invested in the Plastics Recycling transactions, their actions with respect to such investments provide a rational basis for treating them differently.  Miller foreclosed any potential liability for increased interest in his cases by making payments prior to December 31, 1984; no interest accrued after that date. In contrast, petitioners made no such payment, and they conceded that the increased rate of interest under section 6621(c) applies in their cases.  Liability for the increased rate of interest is the principal difference between the settlement in the <u>Miller</u> cases, which petitioners declined when they failed to accept the piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the <u>Miller</u> cases since each of the decisions in <u>Miller</u> recites "That there is no increased interest due from the petitioner[s] for the taxable years [at issue] under the provisions of IRC section 6621(c)."  According to petitioners, "if the Millers were not otherwise subject to the penalty interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include

such a recital in its decisions."  This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies.  In fact, the recital that no increased interest under section 6621(c) was due in the Miller cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy.  There is nothing on the record in the present cases, or in the Court's opinions in Estate of Satin v. Commissioner, T.C. Memo. 1994-435, or Fisher v. Commissioner, T.C. Memo. 1994-434, or in any of the material submitted to us in these cases that would indicate that the Millers were "otherwise subject to the penalty interest provisions".  Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated and differently to the extent they were not.  Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while petitioners concede it applies in their cases.  Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the Miller cases, and also rejected a settlement offer made to them prior to trial of a test case.  In contrast, Miller negotiated for himself and accepted an offer that was essentially the same as the Plastics Recycling project settlement offer rejected by petitioners prior

to trial of their cases.  Accordingly, petitioners' motions are not supported by the principle of equality on which they rely. Cf. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.

To reflect the foregoing,

<u>Appropriate orders will be
issued denying petitioners' motions,
and decisions will be entered for
respondent</u>.